**GOOLEY, Plaintiff, v. DEWITT, Defendant.**

Common Pleas Court, Fayette County.

No. 21600.   Decided October 23, 1954.

Richard P. Rankin, Washington C H., on behalf of plaintiff.
William Junk, Junk & Junk, Washington C. H., on behalf of defendant.

## OPINION

By CASE, J.

This case is before the court upon Plaintiff's petition, Defendant's answer, Plaintiff's reply thereto, certain stipulations, testimony. exhibits, oral motions by Defendant for dismissal of Plaintiff's petition, and arguments of counsel with respect thereto.

The pertinent allegations of Plaintiff's petition read as follows:

(Page one)

"The plaintiff avers that on or about the 1st day of September 1950, she provided funds to Willard DeWitt, to be used by the said Willard DeWitt to purchase for the plaintiff, but in the name of said Willard DeWitt. all of the interest of one Hazel DeWitt Lough in the following described real estate:

"Situate in the State of Ohio, County of Fayette and in the township of Wayne:

"First Tract:

"* * * containing 140 acres of land, more or less.

"Second Tract:

"* * * containing Thirty-eight and sixty-seven one-hundredths (38.67) acres of land, * * *

"such interest consisting of a life estate.

(Page two)

"The plaintiff further avers that said Willard DeWitt did so purchase the land as intended, using the provided funds, and did receive a quit-claim deed for the life estate of Hazel DeWitt Lough on or about the 2nd day of September, 1950.

"The plaintiff further avers that the said Willard DeWitt died on or about the 21st day of October, 1952 and that his widow, Willa DeWitt, was named Executrix and sole beneficiary by his will. Said Willa DeWitt, as executrix, has filed an inventory of the estate of Willard DeWitt in which is included the afore-said described land. Plaintiff says that such land should not be included in the estate of Willard DeWitt since said Willard DeWitt was holding as trustee for the plaintiff. Plaintiff further says that the said defendant claims said premises by virtue of the will of Willard DeWitt and refuses to deliver possession of the same to plaintiff.

"WHEREFORE, plaintiff prays that she be adjudged and decreed to have the beneficial interest in said land and that the defendant be declared trustee for her benefit and the defendant as trustee, be ordered to convey the said land to the plaintiff, and that the plaintiff be granted such other and further relief as she may be entitled to in law or equity, together with her costs herein."

Defendant's answer thereto reads as follows:

"Now comes the defendant, Willa DeWitt, and for answer to Plaintiff's petition admits that on or about the 1st day of September, 1950, certain funds were turned over to Willard DeWitt by the Plaintiff and that thereafter said Willard DeWitt purchased certain premises from Hazel DeWitt Lough. However, defendant denies that said funds were turned over to Willard DeWitt for the purpose as contained in paragraph one of Plaintiff's

petition, but says that said funds were a gift to Willard DeWitt by the Plaintiff.

"The Defendant, by way of answer also admits all those allegations contained in the first two sentences of the second paragraph on page 2 of Plaintiff's petition except the date of death of Willard DeWitt, which was on October 11, 1952 rather than on October 21, 1952, as stated in Plaintiff's petition.

"Further answering, Defendant denies each and every, all and singular statements and allegations contained in said petition, save and except such as are herein expressly admitted to be true.

"WHEREFORE, Defendant prays that Plaintiff's petition be dismissed and that she may go hence and recover her costs herein."

Plaintiff's reply to Defendant's answer reads as follows:

"Now comes the plaintiff, and for reply to defendant's answer, does deny each and every allegation therein contained not previously alleged by plaintiff or admitted by her to be true."

Upon the issues so joined, this cause came on to be heard by and tried to the court and thereupon the following stipulations were made by and between counsel for the respective parties, as they appear on pages 2, 3, and 4 of the Record:

"MR. RANKIN: If the court please, we desire to make certain stipulations with regard to the public records of Fayette County, Ohio.

First, it is stipulated by and between counsel for plaintiff and defendant that the last will and testament of Harry DeWitt was admitted into the record in the probate court on February 25, 1936 and is recorded in Will Record Book 10 at page 333.

I have here a certified copy of that will, which is stipulated, may be admitted solely for the purpose of showing that a life estate in the real estate described in the petition was devised to one Hazel DeWitt and for no other purpose.

"MR. JUNK: We are willing to stipulate. Make no objection whatever. The records do show recording of Harry DeWitt's will and the contents thereof are correct records without having any introduction of evidence.

"THE COURT: The record may so show.

"MR. RANKIN: Second, it is stipulated by and between counsel for Plaintiff and Defendant that a certain deed from Hazel Lough, formerly Hazel DeWitt and her husband, Washington Lough, dated September 2, 1950, filed for record September 2, 1950, and recorded in Deed Record Book 82, page 469, which is witnessed by Ray R. Maddox and Charlotte D. Gooley, and is acknowledged before Ray R. Maddox, Notary Public for the state of Ohio, and which is a quit claim deed purporting to convey to Willard DeWitt and his heirs and assigns forever the real estate which is the subject of this cause of action, and that the original deed is hereby entered and stipulated to be the original deed of conveyance so described.

"THE COURT: Is there any objection?

"MR. JUNK: We have no objection.

"THE COURT: Let the record so show. Let the record also show that within a reasonable time a copy will be substituted in lieu of the original.

"MR. RANKIN: Third, it is stipulated by and between counsel for the plaintiff and defendant that by certificate of transfer, issued by the Fayette County Probate Court dated May 12, 1953, and filed for record May 12, 1953,

and recorded in Deed Record Book 86 at page 189, the life estate which is the subject of this action was transferred from Willard DeWitt, deceased, to Willa DeWitt, together with other interests which are not germaine to this action.

"THE COURT: Are there any objections?

"MR. JUNK: No, we will stipulate that for the records.

"THE COURT: Let the record so show.

"MR. RANKIN: That is all the stipulations we have, your Honor."

The last will and testament of Harry DeWitt, so stipulated and referred to, contained five specifically designated items, numbered one through five, and was executed on October 11, 1932, and a codicil, consisting of three unnumbered paragraphs, which was executed on September 7, 1934.

The pertinent provisions of Harry DeWitt's will relating to the life estate involved in this action read as follows:

"Item Three.

"I give and devise to my wife, Hazel DeWitt, for and during the term of her natural life, all of my real estate of which I may die seized.

"Item Four.

"After the death of my said wife, I give and devise said real estate to my brothers and sisters, in equal shares, and hereinafter named as follows: Minnie DeWitt, Carey Post, Lottie Gooley, Ada Burnett, Florence DeWitt, Dale DeWitt, Clay DeWitt, and Willard DeWitt.

"Should any of my said brothers or sisters predecease my said wife, leaving issue, then I direct that the share which such deceased brother or sister would have taken, if living shall pass to and vest in the issue of such one or more so dying.

"Should any of my said brothers or sisters predecease my said wife and without issue, the share of such one or more so dying shall pass to those surviving my said wife, or to their issue as herein provided."

And in the codicil to said will, the first and second literary paragraphs thereof read as follows:

"I direct that my farm, which at the present time is rented to Burke Kearney, be leased to Willard DeWitt during the life time of my wife, Hazel Gillespie DeWitt, at 50% of the income.

"I will and direct that all my harness and farm implements, one horse, one-half the sheep, one cow and calf shall be vested in and passed to said Willard DeWitt for use and benefit during the life of my said wife."

The quit claim deed so stipulated into the record was designated as Plaintiff's Exhibit "A" and reads in part as follows:

"Know All Men by These Presents, That Hazel Lough, formerly Hazel DeWitt, and Washington Lough, her husband, in consideration of One Dollar and other valuable considerations, to her paid by Willard DeWitt whose address is Washington C. H., Ohio, RFD, the receipt whereof is hereby acknowledged, do hereby Remise, Release and Forever Quit Claim to the said Willard DeWitt his heirs and assigns forever, the following described REAL ESTATE, * * *"

The first witness called on behalf of Plaintiff was Hazel Gillespie DeWitt Lough who testified that she was the former Hazel DeWitt, widow of Harry DeWitt (R. 4); that Harry DeWitt's will provided that Willard

DeWitt was to farm the farm in which she was willed a life estate (R. 5); that she had discussed with Willard DeWitt, as early as 1945, the purchase and sale of her life estate (R. 5); that she had indicated to Willard DeWitt that she would like to sell her life estate and that maybe his sister might be interested in buying it (R. 7); that she and Willard DeWitt did not make an agreement or come to an agreement with regard to the sale of her life estate (R. 7); that she did agree to sell her life estate in the farm to Mrs. Gooley for the sum of $5,000 (R. 8); that she went to Attorney Ray Maddox for the preparation of the deed and the transaction was completed in his office (R. 8); that she, Mrs. Gooley, Willard DeWitt, Wash Lough (her husband) and Mr. Maddox were present in the office when the deed was drawn and her life estate sold (R. 8); that Plaintiff's Exhibit "A" was the deed which transferred her life estate to Willard DeWitt (R. 8); that Plaintiff's Exhibit "B" was the check that was given to her at the time (R. 8, 9); and her signature appeared on the back of said check as an endorser (R. 9).

Upon cross-examination, Hazel Lough testified that her conversations with Willard DeWitt concerning the purchase and sale of her life estate began about 1945 or 1946 (R. 9); that she finally decided to sell her life estate just before the 27th of August in 1950 (R. 10); that she telephoned Mrs. Willard DeWitt that week and Mrs. Willard DeWitt was to tell her when Mrs. Gooley came back to the DeWitt farm home (R. 10); that the money was to be furnished by Mrs. Gooley (R. 10); that, on the following Sunday, she and her husband were told that Mrs. Gooley was at the DeWitt farm home and wanted the Loughs to come over (R. 10); that she told them she was ready to sell to Mrs. Gooley (R. 11); that the deed was to be made to Willard DeWitt (R. 11); that Mrs. Gooley did not say why the deed was to be made to Willard DeWitt (R. 11); that she did not hear any explanation why it was to be in the name of Willard DeWitt (R. 11); that they planned to meet in Mr. Maddox's office (R. 11); that she conferred with Mr. Maddox and asked him to prepare the deed (R. 11); that the transaction was concluded the following Saturday, September 2, 1950 (R. 12); that she read the deed on that date and saw Willard DeWitt's name on it (R. 12); that there was no discussion that day as to why the title was made to Willard DeWitt (R. 12); that, after endorsing the check, Willard DeWitt actually turned it over to her (R. 12); that she did not at that time hear any conversation or have any knowledge as to why the deed was put in the name of Willard DeWitt (R. 12); and that Willard DeWitt continued to operate the farm from the time of transfer until the time of his death (R. 13).

Ray R. Maddox, Attorney-At-Law, testified on behalf of Plaintiff that he signed as a witness on the quit claim deed (R. 14); that he drew the deed (R. 14); that he closed the transaction in his office (R. 14); that Hazel Lough, Wash Lough, Mrs. Gooley and Willard DeWitt were present at the closing (R. 14); that he was acting as attorney on behalf of Mrs. Lough (R. 14); that instructions for preparing the deed were given to him by Mrs. Lough (R. 15); that the deed was prepared, executed and delivered while said parties were present in his office (R. 15); that he was not sure the deed was made out the same day the deal was closed (R. 15); that Mrs. Lough received $5,000 for her life estate (R. 15); that Mrs. Gooley laid the cashier's check on his desk (R. 16); that Plaintiff's Ex-

hibit "B" was a photostatic copy of the cashier's check that was delivered in payment for the life estate (R. 16); and that he had no knowledge of the reason for the drawing of the deed in the name of Willard DeWitt (R. 16).

Mr. Maddox testified, upon cross-examination, that he was present during all of the closing procedure on the sale of the life estate (R. 16); that the cashier's check was made payable to Charlotte D. Gooley (R. 17); that Mr. Maddox had no recollection of any discussion as to why the cashier's check was endorsed payable to the order of Willard DeWitt (R. 17, 18); that the deed was made out in the name of Willard DeWitt (R. 18); that there was a question raised in Mr. Maddox's mind because he understood that Mrs. Gooley was producing the consideration (R. 18); that Mrs. Gooley originally had possession of the cashier's check when they were in his office; but that he could not say whether Mrs Gooley actually handed it to Willard DeWitt who might then have handed it to Mr. Maddox (R. 18).

Charlotte D. Gooley, Plaintiff, testified on her own behalf that she resided in Dayton, Ohio (R. 19); that Willard DeWitt was her brother (R. 21); that she was the Lottie Gooley named in the will of Harry DeWitt (R. 21); that Plaintiff's Exhibit "B" was the cashier's check for $5,000 (R. 21); that she saw Willard DeWitt write his name twice on the back of said check in Mr. Maddox's office on September 2, 1950 at the time the life estate of Mrs. Hazel Lough was transferred (R. 21); that she, Willard DeWitt, Mrs. Lough, Mr. Maddox, and Mr. Lough were present at that time (R. 22); that she provided the $5,000 which was the consideration paid for the life estate (R. 22); and that Plaintiff's Exhibit "B" is evidence of the check which was used for that purpose (R. 22).

At this point in the trial, Plaintiff was not permitted to testify further in chief due to the provisions of §2317.03 R. C., and the Plaintiff rested; whereupon Defendant made the following motion and argument in support thereof:

"MR. JUNK: At this time I would like to make a motion on behalf of the defendant that Plaintiff's petition be dismissed. The basis for that contention is that Plaintiff in this action has failed to introduce proof of a resulting trust and has certainly failed to produce clear, convincing and certain proof of such trust, which is required as set out in cases cited along lines of the case of Norwood v. O'Brien, 30 Abs 652, which I think is very applicable to the case we have here today. We also have the case of Hill v. Irons, 160 Oh St 21 where they were seeking to prove a trust in that case and the court in addition to saying that the evidence must be clear, certain and convincing said that you must establish the existence of the trust beyond a reasonable doubt.

And also in 64 Oh St 1, which sets out the same ruling and the further evidence and testimony that the plaintiff has presented this morning. Certainly the court could take judicial notice of any inference that it be one of gift rather than trust, so that it is our contention that there is a lack of proof of trust." (R. 25, 26)

and, beginning at page 27 of the Record, Defendant further argued as follows:

"MR. JUNK: Your Honor, Mr. Rankin is right but up to this point, there has been nothing introduced actually, whether this is an absolute

deed there has been nothing at all offered in the way of testimony which would as yet tend to show that a trust by agreement was engrafted on this deed. In other words you have to have some agreement. None is alleged.

\* \* \*

"MR. JUNK: And I call attention to the use of the words, 'his heirs and assigns forever.' There was no cutting down on that conveyance of the quit claim deed.

Now admitted those things and they were undisputed. They are admitted by the pleadings in this case. It is counsel's contention that there was a burden upon the plaintiff to engraft upon this transaction to show by competent evidence that there was engrafted on this real estate that was so conveyed and purchased, and that counsel admitted all those other things to be true, that there is not evidence or testimony in the record to show that there is a trust upon this transaction.

In 22 Abs 419, there the court points out that the burden of proof is still on the plaintiff. It is now our feeling that nothing was introduced here this morning to show that any evidence was forthcoming.

In fact the only evidence was that it was a gift rather than a resulting trust, because of the fact that Plaintiff's Exhibit B is endorsed first over to Willard DeWitt and then endorsed by Willard DeWitt over to the seller.

\* \* \*

"MR. JUNK: The burden of proof is still on the plaintiff to show by convincing evidence. That is our contention.

"MR. RANKIN: Mr. Junk is urging the court that it is necessary for the plaintiff to prove that there was an agreement. The plaintiff is of the opinion that the cases do not show or hold that it is necessary to show that, there is a presumption. Plaintiff's proof is sufficient to establish the burden of proof.

"MR. JUNK: We contend that is not the law in Ohio because of the relationship.

\* \* \*

MR. JUNK: I am relying on **Trusts, page 280 Volume 40 of O. Jur., footnote 8 on page 281** in the first sentence. 'The Ohio law is not clear on this point.' "

In considering Defendant's motion for dismissal and the respective arguments relating thereto, the Court has reviewed the cases and authorities cited in an effort to determine the appropriate application of established principles of law to the facts of record herein.

In the case of **Norwood v. O'Brien, Admr., 30 Abs 652,** Ohio Appeals, 1st Dist., Hamilton Co., decided on December 18, 1939, the complete per curiam opinion of the court rendered in that case reads as follows:

"BY THE COURT:

"Heard on appeal on law and fact.

"Plaintiff seeks to engraft a resulting trust on a deed absolute, by parol evidence.

"The law is that a resulting trust may be proved by parol evidence, but the proof must be clear, certain, and convincing. **Harvey v. Gardiner, 41 Oh St 642; Mannix v. Purcell et, 46 Oh St 102; Russell et v. Bruer et, 64 Oh St 1; Boughman v. Boughman 69 Oh St 273.**

"The evidence in this case fails to meet the requirements under the

rule, and a decree for the defendants, appellees here, dismissing appellant's petition, at his costs, will be entered."

Due to the appellate court's brevity in rendering that decision, its opinion fails to reflect any detailed analysis of the pleadings or facts of record therein which would be particularly revealing or assist this Court in applying the law so stated to the pleadings and facts of record in the instant case at bar.

In the case of **Hill v. Irons et al., 160 Oh St 21**, decided June 10, 1953, the Supreme Court of Ohio held:

"1. In order to engraft a trust upon an absolute deed, the declaration of such trust must be contemporaneous with the deed, and the evidence relied upon must be clear, certain and conclusive and must establish the existence of the trust beyond a reasonable doubt.  (**Russell v. Bruer, 64 Oh St 1**, followed.)

"2. Where a written instrument which is executed concurrently with the execution of an absolute deed, and by the parties to the deed, is later relied upon by the grantor as evidence that the deed is in trust, the conduct of the parties with respect to property so conveyed over a period of years subsequent to the execution of the deed, is competent evidence as to the intent of the parties with respect to the creation of a trust."

While there can be no controversy concerning the rule of law set forth in paragraph one of the syllabus in the Hill case, supra, however, the application of that rule to the facts of record in the case at bar must be distinguished upon the principle of law declared and established by the Supreme Court of Ohio in **Gordon v. Rhodes, 158 Oh St 129**, decided June 25, 1952, in paragraph one of the syllabus thereof which reads as follows:

"1. A reported decision, although in a case where the question might have been raised, is entitled to no consideration whatever as settling, by judicial determination, a question not passed upon or raised at the time of the adjudication."

And that rule of law so stated in Gordon v. Rhodes, supra, would be equally applicable in distinguishing the instant case from the factual situation under determination by the Supreme Court of Ohio in **Russell et al. v. Bruer et al., 64 Oh St 1**, cited by Defendant herein and followed by the Supreme Court in Hill v. Irons, supra.

In support of Defendant's motion to dismiss Plaintiff's petition at the close of Plaintiff's evidence in chief, Defendant has cited the case of **Alkire v. Alkire, 22 Abs 419**, Ohio Appeals, 2nd Dist., Madison Co., decided May 18, 1936, and the headnotes thereto state the following principles and rules of law:

"1. A party who furnishes the purchase price of property to be bought by another in his name intends that the property will inure to his benefit, as between parties who are not closely related.

"2. The burden of proof to establish an express trust upon a deed absolute on its face rests upon the plaintiff and must be sustained by clear and convincing evidence.

"3. In an action to declare an express trust on property purchased by another with money alleged by the purchaser to have been given to him and accepted as a gift, and applied to the purchase of the real estate which he has occupied under a recorded deed since the purchase, the

burden of proving the issues raised rests on the plaintiff, no burden being upon the defendant to prove the transaction a gift.

"4. The burden of establishing an express trust upon a deed absolute on its face for property purchased by another with money furnished by the plaintiff is sustained by testimony to the effect that the plaintiff positively controlled the disposition of the money and directed the defendant concerning the method and manner of its expenditure, rather than that the plaintiff intended to give the money to the defendant."

In the Alkire case, supra, the opinion of the Court of Appeals discloses in detail the material allegations contained in the petition and the answer thereto, the evidence and testimony of record, and the relationship of the parties.

A part of the evidence recited therein is set forth at page 420 et seq. as follows:

"The evidence shows that prior to August 26, 1933 the plaintiff was the owner of an unencumbered piece of property situate in Sedalia, Madison County, Ohio, which was worth from $1,500.00 to $1,800.00, the same being known as the Peters property; that plaintiff was a widower and a second cousin of defendant; that plaintiff and defendant entered into an arrangement whereby the defendant and his wife would move into the Peters property and would make a home for plaintiff; that plaintiff was to pay therefor the sum of $5.00 per week; that this arrangement became effective in October, 1932; that on August 26, 1933 the property adjoining, known as the Dorn property, was offered for sale at public auction; that the defendant was the bidder for said property, having bid the price of $1,300.00; that defendant had no money; that plaintiff furnished to defendant the sum of $100.00 in cash on the day of sale as a down payment; that on January 28, 1933 a safety deposit box had been rented by plaintiff but taken in the name of defendant; that plaintiff had placed his valuable papers in said box; that on Sept. 11, 1933, plaintiff took out of said box a bond of the face value of $1,000.00, cashed it, added to it the sum of $200.00 and directed the cashier of the London Exchange Bank to issue a certificate of deposit payable to defendant for the sum of $1200.00; that said certificate was issued, delivered to the defendant, and by him used to pay the balance upon the purchase of said Dorn real estate; that the deed for said property was made in the name of defendant and was recorded, plaintiff paying the fees therefor; that the parties then moved into the Dorn property where they continued to live until the latter part of August, 1934, at which time trouble arose and the plaintiff moved away; that prior to the purchase of the Dorn property the plaintiff had had some demands made upon him by Ida Kellar of Columbus, who claimed that he was the father of her child, which had been born on March 29, 1933; that on May 10, 1935 a complaint in bastardy was filed against plaintiff by said Ida Kellar and on September 13, 1935, a settlement of said proceedings was consummated, whereby plaintiff paid to Ida Kellar the sum of $175.00. None of the foregoing facts are in dispute.

"The evidence further discloses that the overtures concerning the purchase of the Dorn property were made by plaintiff and that the entire plan for the purchase and conveyance of the property was engineered by him. The evidence shows that the plaintiff paid taxes for approximately two years upon the Dorn property and that the Defendant claims that he

refunded to plaintiff the amount of these payments. Both of the parties contend that they paid insurance and repair bills on the property.

"It is claimed that plaintiff made certain admissions concerning the ownership of the Dorn property, but testimony to this effect is denied by the plaintiff. It is apparent from the testimony of defendant that no gift of the contents of the safety deposit box was effected prior to the date of the purchase of this property, as the defendant testifies on page 67 of the record that when the safety deposit box was rented plaintiff told him that the contents should be claimed by him in case of any trouble with the Columbus woman. In his testimony concerning the purchase of this property the defendant says at page 69:

" 'I was out in the back yard when he came out; he says, "Pete, how would you like to own that place and live over there?" I said I would like to do a good many things, but money talks. He says, "if you want that go up there to the sale and buy it. I'll give you the money to pay for it." '

"In his further testimony concerning the purchase of this property the defendant said at page 68:

" 'Q. Were there any other times when he made any statement to you in regard to protecting his property against the woman in Columbus?

" 'A. One other time after I bought this property.

" 'Q. That is the Dorn property?

" 'A. Yes.

" 'Q. All right?

" 'A. The first time was when we were sitting at the table, the first or second day after we moved there. He looked at me; he says: "Pete, this place is yours. You can go ahead and fix it the way you want it. You won't have to worry. The reason I am giving you this property I would rather you would have every penny I got rather than that woman in Columbus." Another time, a short time after that, I can't recall how many days, we were out in the yard. He says: "Pete, this is all yours. I am giving you this. I always want you to have a home. You got this in your name and no danger of them taking it away from you." ' "

In the case at bar it clearly appears that the following facts were undisputed at the close of Plaintiff's evidence in chief:

1. That Harry DeWitt died testate and devised to Hazel DeWitt (his widow) a life estate in approximately 178 acres of land;

2. That said Hazel DeWitt became and was the owner of said life estate from on or about February, 1936 to September 2, 1950;

3. That, on or about August 27, 1950, Hazel DeWitt (then remarried and known as Hazel Lough) agreed to sell and Charlotte D. Gooley agreed to buy said life estate for $5,000.00;

4. That the entire plan for the purchase, payment and conveyance of said life estate was controlled by Charlotte D. Gooley, the plaintiff herein;

5. That the entire purchase price paid for said life estate was furnished by Charlotte D. Gooley at the time and place of making, executing and delivering a quit claim deed therefor to her brother, Willard DeWitt, on September 2, 1950;

6. That said deed purported to convey said life estate to Willard DeWitt and to his heirs and assigns forever, was witnessed by Ray R.

Maddox and Charlotte D. Gooley, and was recorded in the deed records of Fayette County in Deed Book 82, page 469;

7. That said Willard DeWitt died testate, on October 11, 1952, and that his widow, Willa DeWitt (the Defendant herein), was the sole beneficiary by his will; and

8. That the Probate Court of Fayette County issued a certificate of transfer which was recorded in Deed Record Book 86, at page 189, and which transferred said life estate, the subject of this action, from Willard DeWitt, deceased, to Willa D. DeWitt (the Defendant herein), together with other interests which are not germane to this action.

Defendant's motion for dismissal, at the close of Plaintiff's evidence in chief, clearly raised the question of whether Plaintiff's evidence of record at that point had sustained the burden of proof to establish a purchase-money resulting trust upon said deed which was absolute on its face.

By overruling Defendant's motion, this Court determined that Plaintiff had established by clear and convincing evidence that Charlotte D. Gooley (the Plaintiff) positively controlled the disposition of the purchase money and directed the method and manner of its expenditure.

It is equally clear that Defendant's answer did not claim there was a gift of said life estate to Willard DeWitt but claimed solely that the purchase money so paid was a gift to Willard DeWitt by the Plaintiff; however there was no evidence or testimony in the record to show that Plaintiff intended to give Willard DeWitt the $5,000.00 purchase money.

In overruling Defendant's motion for dismissal at the close of Plaintiff's evidence in chief, this Court determined that the brother and sister relationship between the Plaintiff (Charlotte D. Gooley) and Willard DeWitt comes within the classification of "parties who are not closely related" as referred to in the following rule of law set forth at page 421 in the Alkire case, supra:

"It is the law that, **as between parties who are not closely related,** the party who furnishes the purchase price intends that property bought with his money will inure to his benefit." (Emphasis added by this Court.)

In reaching its determination with respect to such relationship, this Court was not unmindful of Defendant's citation of **40 O. Jur., 281, footnote 8,** and the first sentence thereof which reads:

"8. The Ohio law is not clear on this point. * * *"

On the other hand, the Court was equally mindful of Plaintiff's citation of 65 Corpus Juris 421, 422, Sec. 182, which reads as follows:

"Persons in the relationships of brothers, or brother and sister, are generally under no legal or moral obligation to support each other. Hence, such brother, or brother and sister, are strangers within the meaning of the general rule that where property is paid for with the money or assets of a person, and the title thereto is taken in the name of a stranger or person for whom he is under no legal or moral obligation to provide, a resulting trust in the property arises by operation of law in favor of the person furnishing the consideration, or persons claiming under him. It follows that the general rule that he who supplies the consideration is presumed to intend the purchase for his own benefit, rather than for the benefit of a stranger applies, and a resulting trust arises by implication or presumption of law, although rebuttable by parol evidence, and there is no presumption of advancement or gift. * * *"

In the light of the facts of record at the close of Plaintiff's evidence in chief, and upon due consideration of the arguments made and authorities cited by respective counsel, this Court found that Defendant's motion for dismissal of Plaintiff's petition was not well made (R. 33).

The Defendant (Willa DeWitt) then took the stand and testified that her husband (Willard DeWitt) died on October 11, 1952 (R. 33, 34); that she had been in the DeWitt family for eleven years and had known Mrs. Gooley during that time (R. 34); that Defendant's husband got the money from Mrs. Gooley to buy the life estate (R. 34); that, at different times, Defendant had heard Mrs. Gooley discuss the prospective purchase with Willard DeWitt (R. 34, 35); that, about a month after the transaction, Mrs. Gooley said she wanted Willard DeWitt to have it nice for himself in his old age (R. 35); and the record further shows that Defendant further testified as follows (R. 35, 36):—

"Q. What occurred that day?

"A. She was there, and there was Mrs. Hazel Jenkins and myself, and I said 'wasn't that nice what Lottie did for Willard' and Mrs. Gooley said, 'I did that for Willard to make it nice for him in his old days and that is my share of the will.'

"Q. Now, this transfer to your husband is where you are living?

"A. Right where I am living.

"Q. Where is that?

"A. Red brick house on the Chillicothe Road.

"Q. How many acres in the farm?

"A. 178.

"Q. Did you continue to live there after your husband died?

"A. Yes.

"Q. Who farmed the farm?

"A. My husband.

"Q. What produce did he raise?

"A. Well he had his corn, soy beans, wheat and his hogs.

"Q. Who kept the income from the sale of these products?

"A. He did.

"Q. Did he ever give any to Mrs. Gooley?

"A. No.

"Q. Did you continue to live on the farm?

"A. Yes.

"CROSS-EXAMINATION

"BY MR. RANKIN:

"Q. Mrs. DeWitt nothing was expected from Willard DeWitt?

"A. That is right.

"Q. How do you know?

"A. Because he asked her one day.

"Q. How did you acquire that knowledge?

"A. It was what I over heard. I was there and he asked her, now what do you expect out of this and she said I don't want anything, but when you make a million you can hand me a dollar.

"Q. Did she say anything further than that?

"A. No.

"That is all."

Hester Jenkins was called as a witness on behalf of Defendant and testified in part as follows, beginning at page 37 of the Record:

"Q. I will ask you if you were at the home of Mr. and Mrs DeWitt, southeast of Washington Court House at any time during the month of September, 1950?

"A. Yes, I was.

"Q. Who else was present in Mr. and Mrs. DeWitt's home?

"A. Mrs. Gooley.

"Q. Did you know Mrs. Gooley at that time?

"A. Yes.

"Q. Where did Mrs. Gooley live at that time?

"A. Dayton.

"Q. How long were you at Mr. and Mrs. DeWitt's home?

"A. I think just for the day.

"Q. At any time while you were there did you hear any discussion by Mrs. Gooley with reference to a transfer of the farm interest there from a Mrs. Lough? Did you hear any discussion?

"A. Yes, Mrs. Gooley said I want to make it nice for Willard in his old days and that is my share of the will now.

"Q. Do you remember how that conversation came up? Was it in response to something said? How did it come up?

"A. Mrs. DeWitt . . . we were standing in the kitchen just talking and Mrs. DeWitt, said Hester don't you think its nice what Lottie is doing for Willard? I said Yes I think it was lovely. That brought up the subject.

"Q. Was anything further said?

"A. Not of any consequence.

"Q. Do you know that they have continued to live there and farm that farm?

"A. Yes sir.

"Q. Did you ever know whether Mrs. Gooley made her home there?

"A. Not during my acquaintance."

In rebuttal, the Plaintiff, Mrs. Gooley, testified as follows beginning at page 42 of the Record:—

"Q. Mrs. Gooley prior to the time that the deed for the life estate of Mrs. Lough was given, did you have any conversation with your brother, Willard DeWitt relative to that transaction?

"A. Yes.

"Q. Where did these conversations take place, Mrs. Gooley?

"A. At his home.

"MR. JUNK: I object to all this line of questioning. Let the record show a continuing objection throughout the remaining portion of this line of questioning.

"Q. Now what was said in these conversations, Mrs. Gooley?

"A. I was to furnish the money to buy Hazel's estate and to let him have it in his name and if anything happened to him, it was to be given to me. It was to be transferred to me and during his sickness he said he would anytime that this happened, I should get the papers and have them transferred to me.

"Q. During the sickness of Willard DeWitt, did you have any conversation with Willa DeWitt?

"A. Yes.

"Q. Where?

"A. At the hospital and out home.

"Q. What did Mrs. DeWitt say in regard to the transfer of the farm?

"A. She didn't know how she would live on the money they had, as almost all of it was spent on hospital bills, doctors, and that sort of thing.

"Q. Did Mrs. DeWitt make the statement that Willard DeWitt knew that his interest was only for his lifetime?

"A. Well, yes, she understood it that way.

"OBJECTION BY MR. JUNK—Move that the answer be stricken.

"THE COURT: The answer may be stricken.

"Q. Mrs. Gooley, when was the first time that you knew that your brother or his wife was claiming this property for their own?

"A. Not until after his death. After she was told by her lawyers it was hers.

"CROSS-EXAMINATION BY MR. JUNK:

"Q. Mrs. Gooley, isn't it a fact that in the presence of Mrs. Jenkins at the DeWitt farm on or about September 15, 1950, that at that time you made the statement in effect 'I did that to make it nice for Willard in his old age, that was my share of my will.' Isn't that true?

"A. I had no way of knowing.

"Q. Isn't it a fact that you said 'I did that to make it nice for him in his old age. That was my share of my will that I want to give you?'

"A. I had no will or share of any will. If I said that, it was just conversation. How would I give him a share of my will.

"Q. You have a right to dispose of your share of the will? .

"A. I have my will made long ago.

"Q. Isn't it a fact you did say that? Isn't it a fact that you made that statement?

"THE COURT: Mrs. Gooley, you must answer the question. The question asked you by Mr. Junk is in effect whether or not it is a fact that you made the statement. You may answer yes or no.

"Q. Is it a fact that you made that statement?

"A. Yes.

"Q. You did make that statement?

"A. Yes, I suppose I did, if they said so. I don't remember.

"THE COURT: Now is the court to understand you have no further questions?

"MR. JUNK: That is right.

"BY MR. RANKIN:

"Q. When you made this statement with regard to being a nice thing for Willard, what did you mean?

"A. That he was to receive the benefit of what he raised.

"Q. Did you intend by that statement that the property was to pass to his heirs at law?

"A. No.

"Q. Did you at any time during Willard's lifetime ever ask or expect any share from the farm?

"A. I didn't ask for anything and I never received a penny.

"That is all."

Pauline Clark was also called as a rebuttal witness and her testimony

appears on pages 45 to 48 of the Record. Upon reviewing that portion of the record, this Court is of the opinion that her testimony was not material to the issues involved herein.

At the close of all of the evidence referred to above, Plaintiff and Defendant rested; and counsel for Defendant made the following motion which appears on page 48 of the Record:

"And at this time we renew our motion here for dismissal of this petition and we renew it now on the basis that she and I believe by her own statement states that on the witness stand, she intended to give this to Mr. DeWitt. She admitted that she did make the statement, that she wanted to do something for him in his old age and that was his share of her will, and she so testified. For that reason we feel that sufficient evidence has been presented here by the defendant in this case, and also by the defendant while on the witness stand that this petition should be dismissed."

Thereupon, arguments were made and authorities cited by counsel for the respective parties, and the Court took said motion under advisement. The Court now finds that said motion was not well made and should be overruled.

Upon due consideration of all of the evidence adduced herein, the Court finds:

1. That Plaintiff has established by certain, clear and convincing evidence that Charlotte D. Gooley furnished and positively controlled the disposition of said purchase money;

2. That Plaintiff directed the method and manner of expending the $5,000 purchase money for said life estate;

3. That the evidence adduced by Plaintiff was sufficient to and did establish a purchase-money resulting trust upon said quit claim deed which was absolute on its face;

4. That the evidence adduced by Defendant fell far short of rebutting said purchase-money resulting trust;

5. That Defendant's evidence completely failed to establish "that said funds were a gift to Willard DeWitt by the Plaintiff," as alleged in Defendant's answer; and

6. That Defendant's evidence tended to show an inconsistent and ineffective attempt to claim a gift of the life estate so deeded at some time after the purchase-money resulting trust had been established.

The Court further finds that the burden of proof has been sustained by the Plaintiff and that she is entitled to the relief prayed for in her petition.

Therefore, the Court finds on the issues raised between the petition, the answer and reply thereto in favor of the Plaintiff and against the Defendant; and that Defendant should be ordered to convey said life estate in the real estate described in said petition to Plaintiff within ten (10) days of the journal entry to be made in conformity with this decision, and that upon refusal so to do, a certified copy of said entry judgment and decree shall be filed in the recorder's office and shall operate as a transfer; and that the costs herein should be taxed against Defendant.

The Court further finds that Counsel for Plaintiff should prepare an entry in conformity herewith, with appropriate exceptions noted on behalf of Defendant, and submit same to Counsel for Defendant and to this Court for approval within five (5) days from the date of this decision.